UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GUY D. LIVINGSTONE,<br><br>       Plaintiff,<br>- against -<br><br>TOUGH MUDDER INCORPORATED and<br>ACTIVE NETWORK, LLC,<br>       Defendants. | ECF CASE<br><br>1:19-cv-00839 (DLI) (SJB)<br><br>**SECOND AMENDED**<br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

    Plaintiff, Guy D. Livingstone ("Plaintiff" or "Livingstone"), by his attorneys, Golenbock Eiseman Assor Bell & Peskoe LLP, for his Second Amended Complaint against defendants, Tough Mudder Incorporated ("TMI") and Active Network, LLC ("Active"), alleges on knowledge as to his own actions, and otherwise on information and belief, as follows.

### NATURE OF THE ACTION

    1. This action arises out of TMI's willful and material refusal to honor contractual obligations to its minority shareholder, Livingstone. Instead of honoring those obligations, TMI has conveyed valuable consideration to its majority shareholder at Livingstone's expense.

    2. Some of TMI's breaches were facilitated and coordinated by its lender, Active. For the last several years, following Livingstone's departure as an officer of TMI, TMI has been in continuous financial distress, despite Active's extension of approximately $18 million of credit to TMI in 2017 and 2018. In December, 2018, following unsuccessful efforts to find a buyer for TMI, Active induced TMI to make payments and other financial promises to TMI's majority shareholder, on the condition that the majority shareholder resign

3359613.1

from TMI's board of directors, appoint Active's designees to TMI's board of directors, and resign as TMI's chief executive officer. This resulted in Active – and its ultimate parent company, non-party Global Payments Inc. – gaining control over TMI's operations and management, and in TMI breaching contractual obligations to Livingstone.

3. Additionally, a promissory note held by Livingstone that is at issue in this action became due and owing on August 15, 2019, and has not been paid by TMI.

4. As a result of TMI and Active's actions, Livingstone has been injured in an amount not less than $4.3 million.

## THE PARTIES

5. Plaintiff, Guy D. Livingstone, is an individual residing in Switzerland. Livingstone is a citizen of the United Kingdom of Great Britain and Northern Ireland. He is not a citizen of the United States of America, is not admitted for permanent residence in the United States, and is not domiciled in any State within the United States.

6. Upon information and belief, Defendant Tough Mudder Incorporated is a corporation organized under the laws of the State of Delaware, with its principal place of business located within this District at 15 Metrotech Center, 7th Floor, in Brooklyn, New York. TMI is registered with the New York State Department of State to do business within New York.

7. Defendant Active Network, LLC, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 717 N Harwood Street, Suite 2500, in Dallas, Texas. Active is registered with the New York State Department of State to do business within New York.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a)(2). This civil action is between a citizen of a foreign state, on the one hand,

and citizens of States, on the other. The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

9. This Court has personal jurisdiction over all of the defendants pursuant to New York Civil Practice Law and Rules ("CPLR") § 301. To the extent that any defendant is not located in New York, this Court also has personal jurisdiction under CPLR § 302(a) because this action arises out of each defendant's transaction of business in New York.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and a substantial part of the conduct complained of herein occurred in this District.

## FACTUAL BACKGROUND

### A. Livingstone's Relationship to TMI

11. TMI was founded by Livingstone and non-party William Dean ("Dean") in or around 2009. Since its inception, TMI has produced and sold tickets to mass participation obstacle course events, domestically and globally.

12. When TMI was founded, Dean owned 60% of the company and Livingstone owned 40%. At all times since then, Livingstone has been a minority owner of TMI and Dean has been the majority owner.

13. Initially, Livingstone served as an officer of TMI and was significantly involved in the operation and management of TMI.

14. In 2013, as part of an agreement with TMI, Livingstone sold some of his equity to TMI, ceased serving as an officer of TMI and ceased his involvement in TMI's day-to-day operations.

15. After Livingstone ceased his involvement in TMI's operations, TMI suffered a continuous and precipitous financial decline. For example, in 2012 – the last full year

3

of Livingstone's involvement in TMI's operations and management – TMI posted a yearly profit of approximately $10 million. In 2013 – the year of Livingstone's departure – TMI's yearly profit fell to $4 million. Since 2013, TMI has posted a yearly loss in every calendar year except for 2015, when it posted a small profit.

16. Prior to July, 2015, TMI's board of directors (the "Board") was comprised of two directors: Livingstone and Dean. However, following his departure as an officer of TMI, Livingstone had minimal or no say in TMI's affairs. All material decisions were made by Dean or other TMI officers, with no input from or consultation with Livingstone or the Board.

17. On or about July 30, 2015, Livingstone, Dean, TMI, and certain other parties entered into an Amended and Restated Stockholders Agreement (the "Stockholders Agreement"). Among other things, the Stockholders Agreement provided that "the size of the Board shall be set at and remain at no more than five (5) directors." It also provided that "Dean shall have the right to appoint three (3) directors (one of whom may be Dean) and Livingstone shall have the right to appoint two (2) directors, one of whom may be Livingstone."

18. From that time until December, 2018, Dean had the right to control the majority of the Board by appointing a majority of its directors. During that period, Dean served as the Chief Executive Officer of TMI. Through his position as Chief Executive Officer and majority shareholder, Dean controlled TMI's operations and acted as its sole decision-maker, subject in some instances to certain minority-shareholder rights retained by Livingstone.

**B. TMI and Active**

19. In 2017, Active extended credit to TMI by advancing approximately $10 million in cash to TMI, pursuant to an "Active Exchange" agreement, a ticket pre-purchase agreement extended, upon information and belief, to some of Active's largest customers. Under

4
3359613.1

of Livingstone's involvement in TMI's operations and management – TMI posted a yearly profit of approximately $10 million. In 2013 – the year of Livingstone's departure – TMI's yearly profit fell to $4 million. Since 2013, TMI has posted a yearly loss in every calendar year except for 2015, when it posted a small profit.

16. Prior to July, 2015, TMI's board of directors (the "Board") was comprised of two directors: Livingstone and Dean. However, following his departure as an officer of TMI, Livingstone had minimal or no say in TMI's affairs. All material decisions were made by Dean or other TMI officers, with no input from or consultation with Livingstone or the Board.

17. On or about July 30, 2015, Livingstone, Dean, TMI, and certain other parties entered into an Amended and Restated Stockholders Agreement (the "Stockholders Agreement"). Among other things, the Stockholders Agreement provided that "the size of the Board shall be set at and remain at no more than five (5) directors." It also provided that "Dean shall have the right to appoint three (3) directors (one of whom may be Dean) and Livingstone shall have the right to appoint two (2) directors, one of whom may be Livingstone."

18. From that time until December, 2018, Dean had the right to control the majority of the Board by appointing a majority of its directors. During that period, Dean served as the Chief Executive Officer of TMI. Through his position as Chief Executive Officer and majority shareholder, Dean controlled TMI's operations and acted as its sole decision-maker, subject in some instances to certain minority-shareholder rights retained by Livingstone.

**B.     TMI and Active**

19. In 2017, Active extended credit to TMI by advancing approximately $10 million in cash to TMI, pursuant to an "Active Exchange" agreement, a ticket pre-purchase agreement extended, upon information and belief, to some of Active's largest customers. Under

that agreement, Active "pre-purchased" tickets for future TMI events. TMI was obligated to repay approximately $12 million to Active.

20. In early 2018, and despite the fact that TMI had not paid back the existing credit, Active extended an additional $3 million in credit to TMI through the "pre-purchase" of tickets for TMI events.

21. Active made additional extensions of credit throughout 2018 such that, towards the end of that year, it had extended a total of approximately $18 million in credit to TMI through the ticket "pre-purchase" program.

22. At all relevant times, Livingstone held certain minority owner rights such that his consent would be required in order for TMI to acquire traditional debt financing. Upon information and belief, Active and TMI utilized the pre-purchase of event tickets instead of more traditional financing in order to avoid the need for Livingstone's participation and consent.

23. Upon information and belief, sometime in 2018, TMI and Active assessed that there was little or no chance that TMI would be able to pay back the credit extended by Active. TMI began exploring options to sell itself to a buyer who would be able to assume or pay off the debt owed to Active. Active supported and directly participated in this process.

24. By the end of 2018, TMI and Active had been unable to come to terms with any potential acquirer. As a result, upon information and belief, Active decided to take over TMI's operations and management so that it could, unilaterally, make decisions for the company.

25. In December, 2018, with no prior notice to Livingstone, Active, Dean and TMI entered into agreements designed to benefit Dean financially and give Active control of TMI.

26. Active and TMI entered into an amendment ("Amendment No. 7") to the Master Services Agreement under which Active provides financing to the Company. Dean executed Amendment No. 7 on behalf of TMI. Amendment No. 7, dated December 21, 2018, provides for, among other things, (a) Active's immediate payment to TMI of $675,000, (b) a reduction by over $8 million in Active's pre-purchased event rights as against TMI and (c) continued financing to TMI for several years.

27. Active, TMI and Dean entered into a separate agreement titled as a "Services and Governance Agreement," also dated December 21, 2018. Dean executed the Services and Governance Agreement on behalf of TMI and himself, individually.

28. The Services and Governance Agreement provides, among other things, for (a) TMI to immediately pay Dean $675,000, and pay him $225,000 in one year, in satisfaction of certain notes; (b) TMI to make additional payments to Dean if TMI pays amounts owed to Livingstone under notes held by him; (c) TMI to pay Dean a salary for two years, to be backstopped by Active should TMI cease operations; (d) Dean to resign as chief executive officer of TMI; and (e) Dean to exercise his right to appoint three members of TMI's board by appointing three members designated by Active. The last obligation is explicitly required as a condition to Active's refund to TMI of over $8 million in pre-purchased event rights.

29. Following execution of Amendment No. 7 and the Services and Governance Agreement, Dean (a) resigned as chief executive officer of TMI and as a member of the Board, and (b) appointed three individuals designated by Active to TMI's Board. Upon information and belief, some or all of those individuals are affiliated with Active or its parent company, non-party Global Payments. As a result, Active controls three of the five seats on the Board, and effectively controls TMI's management and operations.

## C. TMI's Agreements With Livingstone

### 1. The Intercreditor Agreement

30. On or about October 28, 2014, Livingstone, Dean and TMI entered into an Intercreditor Agreement (the "Intercreditor Agreement"). The Intercreditor Agreement addressed TMI's payment of existing debt and other obligations owed to Livingstone and to Dean.

31. Among other things, Section 2(b) of the Intercreditor Agreement provides that:

> In the event that a Bankruptcy Proceeding or a default under any of the Notes or with respect to the Livingstone Redemption Payment has occurred, the Company and the Creditors agree that the order of payment with respect to the Obligations will be as follows:
>
> First, to the payment to Livingstone of any remaining Cash Consideration, if any, owed to Livingstone under the Redemption Agreement, or if the Livingstone Redemption Note has been issued in accordance with Section 2 of the Redemption Agreement, the remaining principal, interest and fees owed under the Livingstone Redemption Note;
>
> Second, to the payment of all principal, interest and fees owed by the Company to Dean and Livingstone on the Founder Notes, with such payments to be pro-rata based on the then current outstanding principal balance of each of the Founder Notes to the total outstanding principal balance of the Founder Notes; and
>
> Third, to the payment to Dean of all principal, interest and fees owed by the Company to Dean under the Dean Compensation Notes.

32. Among other things, Section 3 of the Intercreditor Agreement provides that:

> (b) Dean and the Company agree that they shall not amend any of the Dean Obligations . . . without notice to and consent of Livingstone;
>
> (e) Neither the Company, Livingstone nor Dean otherwise shall take or permit any action prejudicial to or inconsistent with priority positions created by this Agreement, either in any Bankruptcy Proceeding or otherwise.

3359613.1

33. The agreements that Dean, TMI and Active entered into in December 2018 amended obligations owed by TMI to Dean such that they breached TMI's obligation under Section 3 of the Intercreditor Agreement not to amend any such obligations without notice to and consent of Livingstone. Livingstone was not notified of those agreements prior to execution, and never consented to them.

34. TMI's payment of $675,000 to Dean, pursuant to the Master Services Agreement, was in contravention of the payment priority set forth in Section 2(b) of the Intercreditor Agreement. For the reasons stated herein, at the time that payment was made, TMI was in breach of the Note (as defined below), which constituted a "Livingstone Redemption Payment" under the Intercreditor Agreement. Therefore, at the time that TMI made the $675,000 payment to Dean, it was obligated to make payments to Dean consistent with the Intercreditor Agreement's payment priority, which it did not.

35. In addition to being in contravention of the payment priority, TMI's payment to Dean breached its obligation under the Intercreditor Agreement not to "take or permit any action prejudicial to or inconsistent with priority positions created by this Agreement."

**2.    The Redemption Agreement**

36. On or about June 28, 2016, Livingstone, Dean and TMI entered into a Third Amended and Restated Redemption Agreement (the "Redemption Agreement"). As a result of the Redemption Agreement (in its amended and/or original forms), Livingstone transferred and conveyed some of his equity interest in TMI back to TMI.

37. Among other things, Section 7 of the Redemption Agreement provides that TMI shall pay Livingstone $175,000 each year in quarterly payments commencing in May 1, 2016, with such amount being increased to $200,000 starting on May 1, 2017 (the "Extension Payments").

8

38. The terms of the Redemption Agreement state that TMI shall accrue, and not actually pay, the Extension Payments until such time as TMI satisfied certain conditions with its existing lender. Those conditions were satisfied at least as of March, 2017, at which time TMI was obligated to pay to Livingstone all accrued Extension Payments and obligated to commence paying all Extension Payments on the agreed-to schedule.

39. Despite these obligations, TMI has failed to make Extension Payments to Livingstone, in an amount not less than $314,084.

40. Additionally, the terms of the Redemption Agreement require TMI to pay for, or reimburse Livingstone for, the cost of Livingstone's operation of a cellular telephone in the United States. Beginning in December, 2018, TMI ceased paying for, or reimbursing, this expense.

41. Finally, the terms of the Redemption Agreement require TMI to make a $12,000 annual payment to Livingstone, due on January 15 of each year. TMI failed to make this payment in 2019.

### 3. The Note

42. On or about August 15, 2018, Livingstone and TMI entered into a Promissory Note (the "Note"), with TMI as the obligor and Livingstone as the Payee. The Note is for the principal amount of $3,000,000. By its own terms, the Note matured on August 15, 2019. The Note provides a schedule for the payment of interest to Livingstone.

43. The issuance of the Note was contemplated in the Redemption Agreement, under which Livingstone assigned, transferred and conveyed certain of his shares in TMI to TMI, in exchange for TMI's promise to pay him $3,000,000. The Redemption Agreement provided that in the event TMI failed to pay Livingstone that amount by certain dates, it would issue a

9
3359613.1

promissory note to Livingstone. TMI failed to pay that amount in the required time, and as a result, issued the Note to Livingstone.

44. The Note therefore is a "Livingstone Redemption Note" as defined in the Intercreditor Agreement, such that any default under the Note triggers the payment priority set forth in Section 2(b) of the Intercreditor Agreement.

45. Section 2 of the Note states that the following events, among others, shall constitute an event of default under the Note:

> (1) if Maker fails to pay when due (i) any payment of principal or interest on this Note or (ii) any amounts owing to Payee in respect of the Redemption Agreement, and such failure continues for five (5) business days after the Payee notifies Maker thereof in writing; [or]
>
> (4) if a default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under (A) any of the this Note, the Redemption Agreement or the Intercreditor Agreement dated as October 28, 2014, by and among the Company, the Holder and William T. Dean, (B) any agreement between the Company and the Holder or (C) any other material agreement, mortgage, document or instrument pursuant to which the Company is obligated….

46. TMI's defaults under the Redemption Agreement (as described herein) and the Intercreditor Agreement (as described herein) constitute defined events of default under the Note.

47. Section 2(b) of the Note provides that upon the occurrence of an event of default, the entire principal amount of the Note becomes immediately due and payable, along with any unpaid interest, interest at a default rate accruing from the date of the default, and all reasonable costs and expenses (including reasonable attorneys' fees) incurred by Livingstone in connection with his exercise of any rights and remedies under the Note.

48. On or about January 24, 2019, Livingstone, through his counsel, demanded that TMI pay all amounts due under the Note (such demand is not required as a

10

3359613.1

condition to payment). Despite that demand, TMI has failed to pay Livingstone any amounts due under the Note.

49. By its own terms, the Note matured on August 15, 2019.

50. TMI did not pay the Note's principal amount or any accrued interest on or before that date.

51. Livingstone's counsel sent TMI a Notice of Default and Demand for Payment of the Note (the "Second Notice of Default"), which was delivered to TMI on August 19, 2019. The Second Notice of Default stated that the principal amount of the Note and any accrued interest on the unpaid principal balance was due and payable on August 15, 2019. The Second Notice of Default further stated that no such payment had been made as of August 15, 2019, and that "[s]hould that failure to pay those amounts continue for five business days following the date of this letter, the Company will be in default of the Note pursuant to Section 2(a)(1)."

52. TMI never responded to the Second Notice of Default. TMI failed to make any payments on the Note during the Note's five-business-day cure period.

53. TMI has never articulated any purported defense or excuse for its failure to make payments required by the Note. In fact, in a since-dismissed New York state lawsuit by Livingstone against TMI regarding TMI's failure to pay the Note, TMI did not assert any substantive defenses to the allegations that the Note is valid, due and owing, and that TMI has failed to pay the amounts owed.

## FIRST CAUSE OF ACTION

**(Breach of the Redemption Agreement, against TMI)**

54. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 47 as if fully set forth herein.

3359613.1

55. The Redemption Agreement is a valid, binding contract between TMI and Livingstone.

56. Livingstone has performed all of his material obligations pursuant to the terms of the Redemption Agreement.

57. In breach of the terms of the Redemption Agreement, TMI has failed to pay Livingstone the Extension Payments.

58. In breach of the terms of the Redemption Agreement, TMI failed to make an annual payment of $12,000 to Livingstone on January 15, 2019.

59. In breach of the terms of the Redemption Agreement, TMI has failed to pay for, or reimburse Livingstone for, the cost of Livingstone's operation of a cellular telephone in the United States.

60. TMI's failures to perform its obligations under the terms of the Redemption Agreement constitute material breaches of that agreement.

61. As a direct and foreseeable consequence of those breaches, Livingstone has suffered material injuries.

62. By reason of the foregoing, Livingstone is entitled to judgment against TMI for damages in an amount to be determined at trial, but in no event less than $326,084.

## SECOND CAUSE OF ACTION

**(Breach of the Note, against TMI)**

63. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 56 as if fully set forth herein.

64. The Note is a valid, binding contract between TMI and Livingstone.

65. Livingstone has performed all of his material obligations under the Note.

3359613.1

66. Pursuant to the terms of the Note, TMI's breaches of the Redemption Agreement, as described herein, constitute material breaches of the Note.

67. Pursuant to the terms of the Note, TMI's breaches of the Intercreditor Agreement, as described herein, constitute material breaches of the Note.

68. Pursuant to the terms of the Note, upon the occurrences of the breaches of the Redemption Agreement and the Intercreditor Agreement, the entire principal amount of the Note became immediately due and payable, along with any unpaid interest, interest at a default rate accruing from the date of the default, and all reasonable costs and expenses (including reasonable attorneys' fees) incurred by Livingstone in connection with his exercise of any rights and remedies under the Note.

69. TMI has failed to pay those amounts to Livingstone.

70. TMI's failure to pay those amounts is a material breach of TMI's obligations under the Note.

71. As a direct and foreseeable consequence of those breaches, Livingstone has suffered material injuries.

72. By reason of the foregoing, Livingstone is entitled to judgment against TMI for damages in an amount to be determined at trial, but in no event less than $3,315,985.

### THIRD CAUSE OF ACTION

### (Breach of the Intercreditor Agreement, against TMI)

73. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

74. The Intercreditor Agreement is a valid, binding contract between Livingstone, TMI and Dean.

3359613.1

75. Livingstone has performed all of his material obligations under the Intercreditor Agreement.

76. The agreements that Dean, TMI and Active entered into in December 2018, amended obligations owed by TMI to Dean such that they materially breached TMI's obligation under Section 3 of the Intercreditor Agreement not to amend any such obligations without notice to and consent of Livingstone. Livingstone was not notified of those agreements prior to execution, and never consented to them.

77. TMI's payment of $675,000 to Dean, pursuant to the Master Services Agreement, was in contravention of the payment priority set forth in Section 2(b) of the Intercreditor Agreement. For the reasons stated herein, at the time that payment was made, TMI was in breach of the Note, which constituted a "Livingstone Redemption Payment" under the Intercreditor Agreement. Therefore, at the time that TMI made the $675,000 payment to Dean, it was obligated to make payments to Dean consistent with the Intercreditor Agreement's payment priority, which it did not. This constitutes a material breach of TMI's obligations under the Intercreditor Agreement

78. In addition to being in contravention of the payment priority, TMI's payment to Dean materially breached its obligation under the Intercreditor Agreement not to "take or permit any action prejudicial to or inconsistent with priority positions created by this Agreement."

79. As a direct and foreseeable consequence of TMI's breaches of the Intercreditor Agreement, Livingstone has suffered material injuries.

80. By reason of the foregoing, Livingstone is entitled to judgment against TMI for damages in an amount to be determined at trial, but in no event less than $675,000.

## FOURTH CAUSE OF ACTION

**(Tortious interference with contract, against Active)**

81. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 74 as if fully set forth herein.

82. Upon information and belief, at all relevant times, Active was aware of the existence of the Intercreditor Agreement and the Note, and was aware of TMI's obligations under those agreements. Active extended significant credit to TMI in 2017, continued to do so through the end of 2018, and continues to do so today. Active directly participated in, and supported, TMI's efforts to sell itself. Upon information and belief, those and other circumstances resulted in Active being aware of TMI's obligations under the Intercreditor Agreement and the Note.

83. Active knowingly and intentionally induced TMI to breach its obligations to Livingstone under those agreements. Active agreed to continue extending credit to TMI, to write off significant amounts of TMI's existing debt to Active, and to give TMI other valuable consideration in order to induce TMI to pay significant amounts of money and give other valuable consideration to Dean. In fact, Active directly participated in TMI's giving valuable consideration to Dean: Active advanced to TMI the $675,000 that TMI then immediately paid to Dean under the Master Services Agreement, and Active guaranteed TMI's promise to pay Dean a salary under the same agreement.

84. As a result of the consideration given to him by TMI, Dean resigned as TMI's chief executive officer and as a Board member, and appointed Active designees to three of the five seats on TMI's Board, thus effectively giving Active and its ultimate parent, non-party Global Payments, control of TMI's management and operations. Upon information and belief, Active did not have any right by contract or at law to designate members of TMI's Board

or to force Dean to resign as CEO until it entered into Amendment No. 7 and the Master Services Agreement.

85. As a direct result of Active's actions, TMI breached the Intercreditor Agreement and the Note, as described herein.

86. As a direct and foreseeable result of Active's actions, Livingstone has suffered material injuries.

87. By reason of the foregoing, Livingstone is entitled to judgment against Active for damages in an amount to be determined at trial, but in no event less than $3,990,985.

## FIFTH CAUSE OF ACTION
### (Breach of the Note, against TMI)

88. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 85 as if fully set forth herein.

89. The Note is a valid, binding contract between TMI and Livingstone.

90. Livingstone has performed all of his material obligations under the Note.

91. By its own terms, the Note matured on August 15, 2019, and payment of the principal amount of the Note and any accrued interest on the unpaid balance was due and owing on that date.

92. Section 2(a) of the Note defines several "Events of Default." Section 2(a)(1) specifies that one such Event of Default occurs when "Maker fails to pay when due (i) any payment of principal or interest on this Note . . . and such failure continues for five (5) business days after the Payee notifies Maker thereof in writing."

93. Livingstone provided TMI with the requisite written notice of TMI's failure to pay the amounts due under the Note on August 15, 2019, and TMI did not pay those amounts within the applicable cure period.

16

3359613.1

94. TMI's failure to pay those amounts is a material breach of TMI's obligations under the Note.

95. As a direct and foreseeable consequence of those breaches, Livingstone has suffered material injuries.

96. By reason of the foregoing, Livingstone is entitled to judgment against TMI for damages in an amount to be determined at trial, but in no event less than $3,000,000 plus applicable interest.

## **JURY TRIAL DEMAND**

Plaintiff hereby demands trial by jury of all claims so triable.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff Guy D. Livingstone demands judgment in his favor as follows:

i. On the First Cause of Action, damages in favor of Plaintiff and against defendant TMI in an amount to be determined at trial, but in no event less than $326,084, together with costs and expenses;

ii. On the Second Cause of Action, damages in favor of Plaintiff and against defendant TMI, in an amount to be determined at trial, but in no event less than $3,315,985, together with costs and;

iii. On the Third Cause of Action, damages in favor of Plaintiff and against defendant TMI, in an amount to be determined at trial but in no event less than $675,000, together with costs and expenses;

iv. On the Fourth Cause of Action, damages in favor of Plaintiff and against defendant Active, in an amount to be determined at trial but in no event less than $3,990,985, together with costs and expenses;

3359613.1

v. On the Fifth Cause of Action, damages in favor of Plaintiff and against defendant TMI, in an amount to be determined at trial but in no event less than $3,000,000, together with applicable interest, costs and expenses;

vi. Prejudgment interest on the foregoing amounts;

vii. The costs and disbursements of this action, including reasonable attorneys' fees; and

viii. Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
November 11, 2019

GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP

By: /s/ Michael M. Munoz
Michael M. Munoz

711 Third Avenue, 17th Floor
New York, New York 10017
(212) 907-7300
mmunoz@golenbock.com

*Attorneys for Plaintiff Guy D. Livingstone*